# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERIC W. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-1184 |
| | ) | |
| THOMAS RENA, JOHN HEINLEN, and | ) | |
| CITY OF BLOOMINGTON, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

This matter is now before the Court on Defendants' Motion for Summary Judgment. For the reasons set forth below, the Motion [#13] is GRANTED.

### BACKGROUND

On June 28, 2004, Detective Michael Gray met with a confidential source named "Chris" regarding the sale of crack cocaine in Bloomington, Illinois. Chris advised that "E", who was later identified as Eric Thomas ("Thomas"), would come to Bloomington to sell crack cocaine. Detective Gray then set up a controlled buy, giving Chris $400.00 to make the purchase on July 15, 2004.

On July 15, 2004, Plaintiff, Eric Davis ("Davis"), drove Thomas to Bloomington. Davis and Thomas initially met up with Chris at a Wendy's restaurant next to a Days Inn motel. Davis went inside Wendy's to use the rest room and returned while Thomas and Chris were talking but claims to have not heard any of their conversation. After some discussion between Thomas and Chris, they all drove over to the motel. Thomas got out

of Davis' vehicle and got in Chris' vehicle.  When Thomas returned, he told Davis, "Let's go," and Davis drove away following Thomas' directions.  Chris followed in his vehicle.

At some point, Thomas and Chris consummated the drug transaction.  Thomas delivered 3 grams of crack cocaine in exchange for $400.00.  Shortly after the transaction was completed, Chris met with Detective Gray and told him that Thomas had threatened him and had a gun.  Gray relayed this information to the arrest team, which included Officer Thomas Rena and his canine "Rocky," Officer John Heinlen and his canine "Kao," Officer Bryce Stanfield, Officer Chad Wamsley, and Detective Ken Bays.

Squad cars from the arrest team got behind Davis' vehicle.  As the police cars behind him accelerated their speed, Davis turned the wrong way onto a one-way street, and the officers activated their overhead lights.  At this time, the officers had already received the report that the suspects had a gun and proceeded to conduct a felony traffic stop.  The three squad cars stopped side-by-side behind Davis' vehicle.  The officers took positions around Davis' car, with the canine officers taking the lead role in making the arrest.  Officer Rena was on the driver's side of the vehicle with his canine, Rocky, and Officer Heinlen was on the passenger side of the vehicle with his canine, Kao.

The officers intended to take Davis out of the car first, but when he said that he could not open the door, Thomas was ordered out of the car and was taken into custody without incident.  After Thomas was in custody, Officer Rena holstered his gun and approached the vehicle.  Officer Rena testified that he told Davis to crawl out the window of the car; Davis denies ever having received this instruction.  Davis continued to state that the door would not open from the outside, but eventually got the door open from the inside after receiving permission to do so from Officer Rena.  The officer instructed him to

- 2 -

immediately exit and get down on the ground, but Davis did not do that.  Davis was aware of the dogs on either side of his vehicle, as he could see them and hear them barking, and admits that he may have turned to look in the direction of the dog on the passenger side of the vehicle.  The officers stated that they felt that Davis might be reaching for the gun that was reportedly in the car and released both canines into the car with the command to bite.  Rocky entered the driver's side first and bit Davis on the left thigh.  Kao then entered the passenger side and bit Davis' right bicep and tricep.  Once the officers confirmed that Davis' hands were empty, they gave the canines the command to release and got them out of the car.  The squad cars had active video cameras in them which captured the events.

Davis was taken into custody by Officers Stanfield and Wamsley.  He was transported from the scene by ambulance to St. Joseph Medical Center, where he received three stitches on his arm for the bite.  The bite on his leg did not require stitches.  Davis now has a strip of scars on his right arm and another scar on his leg from the bite.

Davis brought this suit against Officer Rena, Officer Heinlen, and the City of Bloomington (the "City") alleging that the officers used excessive force in releasing their canines to attack him.  Defendants have now moved for summary judgment.  The matter is fully briefed, and this Order follows.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of

a triable issue.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case."  <u>Id.</u> at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Cain v. Lane</u>, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 324.  Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]."  <u>Holland v. Jefferson Nat. Life Ins. Co.</u>, 883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Hedberg v. Indiana Bell Tel. Co.</u>, 47 F.3d 928, 931 (7th Cir. 1995).

## ANALYSIS

In this case, Davis has alleged that Officers Rena and Heinlen used excessive force against him in releasing their canines to attack him during the felony stop. When addressing an excessive force claim brought under §1983, the analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.  <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989).  The validity of the claim must then

be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard.

Where, as here, the excessive force claim arises in the context of the seizure of a citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures." Id.   All claims that law enforcement officers have used excessive force in the course of an arrest or other "seizure" of a free citizen are analyzed under the Fourth Amendment and its objective "reasonableness" standard. Id. at 395.  In other words, to properly state a fourth amendment excessive force claim, a plaintiff must establish that a seizure occurred and that the officer's use of force in effecting the seizure was unreasonable.  United States v. Hernandez, 1997 WL 80916, *3 (N.D. Ill. Feb. 21 1997).

The reasonableness of the officer's use of force is to be judged from the perspective of a reasonable officer on the scene at the moment that the force was used. Graham, 490 U.S. at 396; Abdullahi v. Madison, 423 F.3d 673, 768 (7th Cir. 2005). Courts must consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 395; Lawrence v. Kenosha County, 391 F.3d 837, 843 (7th Cir. 2004).

Here, there is no question that a seizure occurred, because it is undisputed that Davis was detained, restrained, and taken into custody.  The question is whether the use of force was objectively reasonable under the circumstances.  Defendants contend that when the totality of the circumstances is considered, Davis' non-compliance with their

- 5 -

verbal orders and the possibility that he was reaching for a gun justified their release of the canines.

Davis admits that he did not open the door and get out of the car as directed by Officer Rena, but explains his failure to comply and goes on to argue that the officers released their dogs before he was able to get out of the car.  Given Defendants' assertion that they only released the dogs after he made a move that caused them to believe that he might be reaching for the gun that they had been told was in the car, Davis contends that there is a dispute of material fact precluding summary judgment.

Defendants assert a claim of qualified immunity.  In <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), the United States Supreme Court enunciated the "modern standard to be applied in qualified immunity cases."  <u>Auriemma v. Rice</u>, 895 F.2d 338, 341 (7th Cir. 1990). The Court stated:

> Governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

<u>Harlow</u>, 457 U.S. at 818.   The test for qualified immunity is "whether the law was clear in relation to the specific facts confronting the public official when [he or she] acted."  <u>Green v. Carlson</u>, 826 F.2d 647, 649 (7th Cir. 1987).  In deciding whether a defendant will enjoy qualified immunity, courts must determine:   "(1) whether the plaintiff has asserted a violation of a federal right, and (2) whether the constitutional standards implicated were clearly established at the time in question."  <u>Eversole v. Steele</u>, 59 F.3d 710, 717 (7th Cir. 1995), *citing* <u>Kernats v. O'Sullivan</u>, 35 F.3d 1171, 1176 (7th Cir. 1994).  The first issue is a threshold one.  <u>Scott v. Harris</u>, ___ U.S. ___, 127 S.Ct. 1769, 1774 (2007), *citing* <u>Saucier</u>

- 6 -

v. Katz, 533 U.S. 194, 201 (2001).  If the plaintiff fails to state a violation of a federal right, then the plaintiff's claim fails altogether and the court need not go on to decide whether the law was clearly established at the time of the offense.  Id.; *see also,* Marshall v. Allen, 984 F.2d 787, 793 (7th Cir. 1993); Zorzi v. County of Putnam, 30 F.3d 885, 892 (7th Cir. 1994); Eversole, 59 F.3d at 717.  In outlining the approach a court must take in addressing qualified immunity, the Seventh Circuit has advised:

> Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law.

Landstrom v. Ill. Dept. of Children & Family Serv., 892 F.2d 670, 675 (7th Cir. 1990), *quoting* Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988) (en banc), *cert. denied*, 109 S.Ct. 497 (1989).

Courts have found issues of material fact as to the reasonableness of an officer's conduct where force causing serious injury was employed **after** a suspect was subdued or had otherwise submitted to the officer's authority and was not attempting to resist.  *See* Rambo v. Daley, 68 F.3d 203, 207 (7th Cir. 1995); Mason v. Hamilton County, 13 F.Supp.2d 829, 837 (S.D.Ind. 1998) (finding that an officer who ordered a canine to attack a suspect after the suspect had surrendered, been handcuffed, and was not resisting arrest would have acted unreasonably as a matter of law); Vethekan v. Prince Georges County, 154 F.3d 173, 179 (6th Cir. 1998) (holding that failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context).  That being said, this is not a case where Davis was already handcuffed or otherwise subdued when the canines were released.  Although he offers explanations for why he failed to comply with the officers'

orders, he admits that he could see the dogs and hear them barking and that he had been ordered to open the driver's door and exit the vehicle multiple times before the canines were released but did not do so.  (Davis Dep. at 21-24, 29)

Davis does not dispute that the officers had been told that there was a gun in the car or that his passenger had participated in a drug transaction that evening.  He also makes key admissions with respect to his conduct after the car door was finally opened.  He concedes that once the door was open, there was some delay, and he didn't try to get out right away.  (Davis Dep. at 24)  While he offers explanations for his failure in claiming that he hesitated because the officers had their guns out with the dogs right there and that he had to wait for the seatbelt to retract, he has essentially admitted that he failed to immediately comply with the officers' orders to get out of the car.

Davis also admits that after the door was opened, he "might have" turned to look at the dog on the passenger side of the car.  (Davis Dep. at 25) It is with respect to this material fact that the dashboard videos of the incident that are included in the record before the Court become critical, and Davis has admitted that the videos accurately reflect the events as they transpired.  (Davis Dep. at 43)  Movement toward the passenger side and away from the driver's side of the vehicle is clearly visible in the dashboard videos made by the recording devices in the squad cars, particularly when viewed frame by frame in slow motion.  Two minutes into the felony stop, Davis can be seen opening the driver's door with his left hand.  Over the next three seconds, he then moves outward to the point that his left arm is fully visible outside the car almost up to his shoulder, and his head moves outward to the point that the entire bill and half of his cap are outside the doorframe of the car. Davis then begins to move back into the car to the point that no portion of his head or cap

are visible outside of the car and his left arm can only be seen up to his elbow before it finally disappears entirely into the car one second later.  Frame by frame examination of the video reveals that it is only after Davis makes this move back into the car and away from the driver's side that Officer Rena released his canine, a point conceded by Davis' counsel after viewing the video frame by frame in slow motion during oral argument.  Thus, the videotape negates  any suggestion by Davis that he did not make a movement toward the passenger side of the car prior to the release of the canines.  *See* <u>Scott</u>, 127 S.Ct. at 1776 (finding that where a non-moving party's assertion of fact is "blatantly contradicted" and "utterly discredited" by evidence captured on a videotape of the encounter to the point that no reasonable jury could belief it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

Davis' counsel also attempted to explain the movement by suggesting that Davis was in the process of exiting the vehicle when he got "hung up" by a malfunctioning seat belt.  While this is a clever argument and an example of zealous advocacy, it is simply unsupported by admissible evidence in the record.  The following exchange took place during Davis' deposition:

> Q.   Now, when the police officer was giving you commands to get out of the car, why was it that you didn't get out of the car right away?
>
> A.   Like I said, the vehicle – that was my first time driving it. And the way the door – the seat belt, it was one of those cars where you open the door, and the seat belt lets down.  So, if you – if the seat belt not – the door not open, the seat belt won't – I didn't know how to get it unattached to get out.  You know what I mean?  So, the only way to get out of the vehicle was to open the door. But for some reason, when I tried to open it from the outside, it wouldn't open.

- 9 -

* * *

Q.      It looks like once you got the door open, there wasy some delay.  It didn't look like you tried to get out right away; is that correct?

A.      (Witness nods head.)

Q.      Is that a yes?

A.      Yes.

Q.      And why was that?

A.      With the – because he, he was giving me commands the whole time.  And they had their guns out, then he had the other dog, so I didn't want to make no sudden movements or I didn't want to do anything that would maybe possibly get me shot or something.

* * *

Q.      And after the door on the car was opened, what was the instruction that he gave you?

A.      Get out of the vehicle.  To get on the ground.

Q.      But you didn't do that?

A.      Well, I moved as fast as I could.  Because at the same time when the door opened, you had to give the seat belt time to come from over my shoulder to go down so I could get out.

* * *

Q.      When you were pulled over, were you able to undo the lap belt part of the seat belt?

A.      It wasn't a lap belt.  It was one of the deals where it was on the door.  Like when you open the door, it go down.

Q.      Okay.  There was a shoulder strap that came across?

A.      Yeah.  Yeah.

- 10 -

Q.     Was there a lap belt part that you had to do by hand?

A.     No.  Not – I don't remember that.

Q.     Okay.  Was there a lap belt part at all?

A.     I'm not sure.

Q.     Okay.  So, to the best you can remember, the only part
       of it was that part that came across automatically?

A.     Uh-huh.

Q.     Is that a yes?

A.     Yes.

Q.     So you weren't strapped in by a lap belt?

A.     No.

(Davis Dep. at 23-25, 41-42)  Thus, Davis did not actually claim that he tried to get out but

got "hung up" on a malfunctioning seat belt, and the record is otherwise devoid of any

evidence of a seatbelt malfunction.

What Davis actually claimed was that he had to wait momentarily for the seat belt

to retract, and in this respect, the videotape is again instructive.  Assuming that the seatbelt

operated in the manner described by Davis with a retractable shoulder belt and no lap belt,

the videotape confirms that more than three seconds had passed between the time the

door opened and the time that he made his movement in the opposite direction, which

would have allowed plenty of time for a retractable seatbelt to retract.  By the time he

began to move back into the car, his arm was visible almost up to his shoulder, and the

video does not show any shoulder belt preventing him from exiting the vehicle.  That being

said, even if Davis' movement was actually because of some difficulty with the seatbelt, his movement was also consistent with reaching to a weapon.

Given the officers' belief that there was a gun in the car, the amount of time that had passed without compliance to repeated orders to get out of the vehicle, Davis' admission that he may have looked back in toward the passenger side of the car, and the irrefutable evidence establishing that Davis made a movement back toward the interior passenger side prior to the release of either dog, a reasonable officer could certainly have perceived Davis' actions to be a direct threat to their safety. In fact, the officers have testified that they believed that he was reaching for the gun and released the canines in response.

Assuming *arguendo* that Davis could demonstrate a Fourth Amendment violation, the undisputed facts indicate that Officers Rena and Heinlen are nevertheless entitled to qualified immunity. It is Davis' burden to demonstrate that the law was clearly established at the time of the incident. Rakovich, 850 F.2d at 1209; White v. City of Markham, 310 F.3d 989, 993 (7th Cir. 2002). Davis responds to Defendants' assertion of qualified immunity with a two paragraph argument citing three cases: Szabla v. City of Brooklyn Park, Minnesota, 429 F.3d 1168 (8th Cir. 2005); Watkins v. City of Oakland, California, 145 F.3d 1097, 1093 (9th Cir. 1998); and Sallenger v. Oakes, 473 F.3d 731, 741 (7th Cir. 2007).              I          n evaluating an assertion of qualified immunity, the Court first looks to precedent from the Supreme Court and the Seventh Circuit Court of Appeals. United States v. Harju, 466 F.3d 602, 610 (7th Cir. 2006). The only case that Davis cites from either of these jurisdictions is  Sallenger v. Oakes, 473 F.3d 731, 741 (7th Cir. 2007). However, Sallenger is inapposite to the case now before the Court, as it does not even involve the use of a police canine. Rather, that case involved officers responding to a mentally ill individual experiencing a

severe psychotic episode during which they  "delivered repeated, closed-fist blows and blows with flashlights to the back of [the suspect's] shoulders and thighs after [he] was handcuffed," delivered a blow to his head which may have constituted deadly force, and then proceeded to hobble him "after he had stopped trying to kick or move."  Id., at 740. The suspect ultimately had a heart attack and stopped breathing after the officers failed to place him in the proper position after hobbling him to assist his breathing and avoid positional asphyxiation.  Id., at 734-36.  The case now before this Court does not involve either a mentally ill subject, positional asphyxiation due to the use of hobbling, or the continued use of force after the subject was handcuffed and restrained.

Davis next cites Szabla, an Eighth Circuit case in which a homeless man was sleeping in a city park when a police canine searching for an injured driver from a nearby accident found him and bit him repeatedly, resulting in 23 tooth punctures on his legs and hip.  429 F.3d at 1172.  Unlike Davis, Szabla had no notice that the police or the canine were present, was not believed to be armed, and had not repeatedly failed to comply with orders from the officers.  Even under those circumstances, the Eighth Circuit found that the officer was entitled to qualified immunity.  Id., at 1174.  Furthermore, even assuming that Szabla was somehow probative of Davis' position, it was not decided until December 1, 2005, which is more than a year after the events in this case.

Finally, Davis cites Watkins v. City of Oakland, California, 145 F.3d 1087, 1093 (9th Cir. 1998), for the proposition that "[n]o particularized case is necessary to inform the police officers of the unlawfulness of this conduct."  However, this case is also readily distinguishable, as there was no evidence indicating that the subject, who was running within a building, was armed or posed a direct threat.  Id., at 1090.  In Watkins, the canine

was released into the building to find the subject.  Id.  In that case, the canine found the subject, bit him, and continued to bite and hold him.  Id.  Upon finding the canine and subject, the officer did not call the canine off or order him to release his bite; rather, the officer pulled the subject out from his hiding place and the dog continued to bite him despite the fact that he was obviously unarmed and was surrounded by armed officers with guns drawn.  Id.  The paramedic called to the scene reported that the subject suffered "multiple lacerations and punctures to [Watkins'] left foot," as well as "a jagged tearing of the skin" and "a puncture deep enough to allow him to see Watkins' tendons."  Id.

The Ninth Circuit found that there was no clearly established law prohibiting the use of a "bite and hold" technique with a police canine, but that "it was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation."  Id., at 1092-93.  Here, Davis was aware of the dogs' presence, and there is no evidence that the duration of the dogs' bite was excessive or that the dogs were improperly encouraged to continue the attack after Davis was finally removed from the car.  The  dashboard videos from the squad cars confirm that the canines were in the car for no more than 15 seconds, and it is undisputed that once the officers confirmed that Davis did not have a gun, they ordered the canines to release their bite and got them out of the car.  In his deposition, Davis conceded that the dogs were in the car with him for only 15-20 seconds, and that the dogs bit, got another grip, and just held on.  (Davis Dep. at 34) Unlike the situation in Watkins, the record is simply devoid of evidence that could promote the reasonable inference that the duration of either canine's bite was excessive or that there was any

improper encouragement to continue the attack after it was determined that he posed no direct threat.

The Court has found no caselaw in the Supreme Court or Seventh Circuit establishing that the use of the canines under the circumstances presented in this case would constitute excessive force.   The closest that the Seventh Circuit has come to addressing this situation was in  Bey v. Cimarossa, 202 F.3d 272, 2000 WL 12830 at *2 (7th Cir. 1999), where the Court of Appeals cited Vathekan in noting that whether the suspect was resisting/attempting to flee or was given an opportunity to peacefully surrender before the canine was ordered to attack were material considerations in evaluating the reasonableness of the officer's actions.

That being said, this case is readily distinguishable from Bey or Vathekan.  In Bey, the plaintiff claimed that he was not attempting to evade arrest in any way and had not been given any notice or an opportunity to surrender peacefully before the dog was released.  202 F.3d 272, 2000 WL 12830 at *2.  In Vathekan, the plaintiff was sleeping in her own home and received no notice that her home was being searched, much less that a canine was being released into the residence.  154 F.3d at 176-77.

Unlike those cases, Davis admits that the officers had been advised that there was a gun in the car, that he was well aware of the presence of the dogs on either side of his car, that he had failed to comply with numerous orders to get out of the car, and that he had been given multiple opportunities to exit the vehicle and surrender peacefully (as his passenger had done).  It is important to note that Officers Rena and Heinlen did not release their dogs into the car until after Davis stopped moving outside of the driver's side and

started moving back inside the car, which the officers have testified was construed by them as a furtive gesture indicative of a direct threat.

Although not binding precedent, the factual scenario in <u>Brewer v. City of Napa</u>, 210 F.3d 1093, 1096 (9th Cir. 2000), is instructive.  In <u>Brewer</u>, a canine was being used by the officer to track a fleeing suspect.  <u>Id.</u>  Once the suspect was located, the officer released his canine and ordered it to bite after the suspect stopped raising his hands in surrender and "started slowly dropping them back down in front," causing the officer to fear that he might be reaching for a weapon  <u>Id.</u>  Once the officer had established control over the suspect, he ordered the dog to cease, and the canine released his bite and hold on the suspect.  <u>Id.</u>  The Ninth Circuit affirmed a verdict in favor of the officers, noting that the relevant inquiry in assessing the reasonableness of the officer's action was whether the suspect might have posed an immediate threat to the safety of the officer and others.  <u>Id.</u>, at 1098.  The circumstances in the case now before the Court would satisfy this criteria.

While the use of excessive force in effecting an arrest is a clearly established violation of the Fourth Amendment, the Supreme Court has held that the alleged legal right cannot be so general as to allow a plaintiff to "convert the rule of qualified immunity . . . into a rule of virtually unqualified immunity simply by alleging violation of extremely abstract rights."  <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987); *see also*, <u>Maltby v. Winston</u>, 36 F.3d 548, 554 (7th Cir. 1994) (finding that a plaintiff cannot avoid a finding of qualified immunity by asserting that his right to be free from excessive force was clearly established.)  Qualified immunity protects the officers unless the unconstitutionality of their actions was apparent, either because a case on point or closely analogous precedent

establishes the unconstitutionality of their actions, or because the contours of the right are so established as to make the unconstitutionality obvious.

Davis has not cited, and the Court is otherwise unaware of, any binding or closely analogous precedent establishing that releasing canines would be an excessive use of force under the undisputed facts and totality of the circumstances presented in this case. Nor has he demonstrated that the contours of his alleged right are so well-established that the unconstitutionality would have been obvious here.  Thus, Davis has failed to meet his burden to defeat the assertion of qualified immunity, and the Court cannot find that it was clearly established in July 2004 that the use of canines to gain control of a non-compliant subject who was thought to present a direct threat would violate Davis' rights, particularly where he had been given what reasonably appeared to be an ample opportunity to surrender peacefully, the duration of the bite was not excessive, and the force did not continue after he was restrained.  The Court must therefore conclude that Defendants are entitled to qualified immunity.

### CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment [#13] is GRANTED.  All existing deadlines are vacated, and this matter is now TERMINATED.

ENTERED this 9th day of November, 2007.


s/ Michael M. Mihm
Michael M. Mihm
United States District Judge